Kristina RAMOS, Appellant,

v.

The STATE of Texas, State.

No. 2–03–037–CR.

Court of Appeals of Texas,
Fort Worth.

Dec. 18, 2003.

Richard Gladden, Denton, for Appellant.

Bruce Isaacks, District Attorney, Kathleen Walsh, Asst. Dist. Atty., Charles E. Orbison, Asst. Dist. Atty., Lisa Decker, Asst. Dist. Atty., Melissa Maldonado, Asst. Dist. Atty., Denton, Matthew Paul, State Prosecuting Attorney, Austin, for State.

Panel A: CAYCE, C.J.; GARDNER, J.; and SAM J. DAY, J. (Retired, Sitting by Assignment).

## OPINION

SAM J. DAY, Justice (Retired).

### I. INTRODUCTION

Appellant Kristina Ramos pled guilty pursuant to a plea agreement to the Class B misdemeanor offense of driving while intoxicated (DWI). Prior to her plea, appellant filed a motion to suppress all blood evidence obtained following her accident and all results of any testing of such evidence. The trial court entered an order denying appellant's motion to suppress, which contained findings of fact and conclusions of law. In eight issues, appellant claims the trial court erred in its ruling. We affirm.

### II. FACTUAL AND LEGAL BACKGROUND

On March 31, 2002, appellant crashed her automobile into a tree while driving in Denton, Texas. Kyle Wellman, a firefighter and paramedic with the City of Denton Fire Department, responded to a report of appellant's accident just before three o'clock that morning. Appellant was "profusely bleeding" from her forehead and her left collar bone was broken, but in Wellman's opinion, her injuries were not life threatening. Appellant informed Wellman she had been drinking. Denton Police Officer Elizabeth Carpenter, who later arrived at the scene, noticed that appellant exhibited signs of intoxication including some slurred speech, red eyes, and alcohol on her breath. Since appellant had been injured in the accident, the officer believed that field sobriety tests would not be appropriate.

In accordance with appellant's wishes, Wellman provided medical treatment at the scene and then transported appellant to Denton Community Hospital. At the hearing on the motion to suppress, appellant testified she did not know if the accident had knocked her unconscious, but she did not recall talking to Wellman or Officer Carpenter or being transported to the hospital. Wellman testified that appellant was "alert and oriented" at the scene, she never lost consciousness from the time he

encountered her until the time she arrived at the hospital, and she was not in shock. Moreover, Officer Carpenter testified she never saw appellant lose consciousness and testified that she and appellant were able to converse in the ambulance.

At the hospital, Officer Carpenter found appellant in the "X-ray room." She testified that appellant was upset, but alert and oriented and responded candidly to her questions about the accident. When the officer asked what caused the accident, appellant told Officer Carpenter she had drunk about six vodka tonics and that the accident happened because she got "too drunk." When the officer asked, "Would you be willing to give me a voluntary blood draw," appellant responded, "[Y]es." The officer testified that when appellant gave consent, she was not under arrest and had not been threatened with jail, physical force, or with a search warrant. The officer also testified that she did not obtain written consent because appellant was strapped to a backboard and because the officer did not want to aggravate whatever injuries she had. Officer Carpenter characterized appellant's consent as voluntary, intelligent, and knowing.

At the direction of Officer Carpenter, a hospital employee took a specimen of appellant's blood and turned it over to the officer. Testing by the Department of Public Safety later showed a blood alcohol content of 0.19. A short time later, a hospital employee conducted a second blood draw for medical purposes. Testing by the hospital later showed a presumptive alcohol concentration in appellant's blood of 207 milligrams of alcohol per "0–10" deciliters of blood. The officer testified that appellant did not give consent for the hospital employee to give the officer the tube containing appellant's blood specimen and that the officer did not consider obtaining a warrant in order to take possession of the tube. On the informed consent form contained in the medical records, the notation "[m]ultiple injuries unable to sign" appears in the space for patient's signature, and the initials "H.E." appear on the witness line.

Appellant testified that she was physically able to sign the consent forms. However, she also testified she was "in like a state of shock," remembered she only "woke up" twice at the hospital, and did not remember talking to anyone. Despite having no recollection of talking to anyone, appellant also testified she never consented to a blood draw for the police or the hospital. On cross-examination, appellant admitted she might have had a conversation following the accident that she could not remember.

The next day, appellant was transferred to another hospital without being arrested. A few days after the accident, Officer Carpenter obtained a grand jury subpoena from Kevin Henry, a Denton County Assistant District Attorney, for the purpose of securing medical records from the accident because she suspected it might involve the offense of DWI. Pursuant to the subpoena, an "information vendor" employed by the hospital delivered appellant's medical records to Officer Carpenter on April 18, 2002.

Officer Carpenter retained the medical records for "several months" in her office, after which the records were not delivered to the grand jury, but instead were "probably" delivered to a prosecutor that handles misdemeanor DWI cases, for the purpose of filing an Information against appellant on the charge. Based on an "Affidavit of Probable Cause" executed by Officer Carpenter on June 6, 2002, appellant was charged on September 17, 2002, by Information, with the Class B misdemeanor offense of DWI.

## III. STANDARD OF REVIEW

In reviewing a trial court's denial of a motion to suppress evidence, we must be deferential to the trial court's determination of the historical facts supported by the record. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997). We review a trial court's ruling on a motion to suppress for abuse of discretion. *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex.Crim.App. 1996). Under this standard, we view "the evidence in the light most favorable to the trial court's ruling," affording almost total deference to the trial court's findings of historical fact supported by the record. *Guzman*, 955 S.W.2d at 89. Likewise, we are to utilize the same deference in reviewing the trial court's rulings on mixed questions of law and fact when the resolution of the questions turns on an evaluation of credibility and demeanor. *Id.* However, we review de novo mixed questions of law and fact that do not fall within the preceding two categories. *Id.*

## IV. CONSENT TO PROVIDE BLOOD SAMPLE TO POLICE

In issue five, appellant claims that the trial court's ruling that she consented to provide a blood sample to Officer Carpenter and its "implicit finding regarding the scope of the consent given" violated the federal and state constitutions.[1] In issue six, appellant contends that under the federal and state constitutions Officer Carpenter was not entitled to take possession of the blood sample from the hospital nurse without a warrant.[2]

### A. Voluntariness of Appellant's Consent

The issue of whether appellant voluntarily consented to providing Officer Carpenter with a specimen of her blood is a mixed question of fact and law. *See State v. Hunter*, 102 S.W.3d 306, 309 (Tex. App.-Fort Worth 2003, no pet.). The critical question is whether the resolution of this issue "turns" on an evaluation of credibility and demeanor. *Vargas v. State*, 18 S.W.3d 247, 253 (Tex.App.-Waco 2000, pet. ref'd). "[A] question 'turns' on an evaluation of credibility and demeanor when the testimony of one or more witnesses, if believed, is *always* enough to add up to what is needed to decide the substantive issue...." *Loserth v. State*, 963 S.W.2d 770, 773 (Tex.Crim.App.1998). In other words, if we believed everything testified to by Officer Carpenter, would her testimony always be enough to support a finding that appellant voluntarily consented to provide a sample of blood? *See id.* We believe it would. Therefore, we must give an almost total deference to the trial court's ruling. *Hunter*, 102 S.W.3d at 309; *Guzman*, 955 S.W.2d at 89. Moreover, if the trial court's decision is correct on any theory of law applicable to the case, we will sustain the trial judge's decision. *Hunter*, 102 S.W.3d at 309.

The taking of a blood specimen is considered a search and seizure within the meaning of the Fourth Amendment to the United States Constitution and Article 1, Section 9 of the Texas Constitution. *Schmerber v. California*, 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966); *Ferguson v. State*, 573 S.W.2d 516, 520 (Tex.Crim.App.1978). When a search without a warrant is made, the State bears the burden to show that the search falls within one of the narrow exceptions to the warrant requirement in order for the search to be constitutionally permissible. *Mendoza v. State*, 30 S.W.3d 528, 531 (Tex.

1. *See* U.S. Const. amend. IV; Tex. Const. art. I, § 9.

2. *See id.*

App.-San Antonio 2000, no pet.). Consent to the search is an exception to the requirement for a warrant and requires that the State prove by clear and convincing evidence, based on a totality of the circumstances, that the defendant gave consent freely and voluntarily.[3] *Hunter,* 102 S.W.3d at 310 (citing *Reasor v. State,* 12 S.W.3d 813, 818 (Tex.Crim.App.2000)). If consent is obtained through duress or coercion, whether actual or implied, that consent is not voluntary. *Id.* (citing *Allridge v. State,* 850 S.W.2d 471, 493 (Tex. Crim.App.1991), cert. denied, 510 U.S. 831, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993)). Moreover, "voluntariness" of consent cannot be shown where "a person is unconscious or incapacitated." *Reasor,* 12 S.W.3d at 817.

After considering the evidence, which we described above, the trial court made the following findings of fact regarding appellant's consent in its order denying the motion:

> On March 31, 2002, Officer Carpenter went to the hospital and requested blood from [appellant]. [Appellant] was not under detention, arrest, or custody. [Appellant] gave oral consent to giving the blood to Officer Carpenter. [Appellant] was conscious and alert at the time she gave oral consent.... Officer Carpenter took possession of the requested blood sample and submitted it for testing to the Texas Department of Public Safety.

The trial court also made the following conclusions of law regarding appellant's consent: "[Appellant] voluntarily, freely, and knowingly consented to providing a

blood sample to Officer Carpenter. The consent given by [appellant] was not a result of duress or coercion."

Appellant claims the evidence of consent in the present case constituted a showing "even more anemic" than that found insufficient in *State v. Comeaux,* 786 S.W.2d 480, 484–85 (Tex. App–Austin 1990), *aff'd,* 818 S.W.2d 46, 53 (Tex.Crim.App.1991) (plurality opinion). Specifically, appellant argues that Officer Carpenter failed to inform her of the purpose of the blood specimen; failed to inform her of the consequences of her refusal, in accordance with Section 724.015 of the Texas Transportation Code; and failed to obtain her written consent.

■ However, the facts of *Comeaux* are different than those in the present case. In *Comeaux,* the officer did not directly ask for the defendant's consent, and the defendant never gave direct consent to provide a blood specimen to police. *Id.* at 484. The only blood drawn in *Comeaux* was drawn by a private hospital and then later obtained and tested by police under false pretenses. *Id.* at 482–84. Here, the evidence shows appellant voluntarily consented to providing the police a sample of her blood, and Officer Carpenter made no misrepresentation in obtaining the sample. Moreover, the statutory warnings in Chapter 724 of the Texas Transportation Code apply "only to persons under arrest when the blood sample is taken." *State v. Laird,* 38 S.W.3d 707, 713 (Tex.App.-Austin 2000, pet. ref'd). Here, appellant was not under arrest when she consented to provide the sample.

---

**3.** Although the United States Constitution only requires the State to prove the voluntariness of consent by a preponderance of the evidence, the Texas Constitution requires the State to show by clear and convincing evidence that the consent was freely given. *Carmouche v. State,* 10 S.W.3d 323, 331 (Tex. Crim.App.2000); *Hunter,* 102 S.W.3d at 310 n. 4.

 Therefore, under the relevant factors considered in past cases to determine the voluntariness of consent to draw blood, we conclude there was substantial evidence to support the trial court's finding that appellant voluntarily consented to the drawing of a sample of blood, despite appellant's inconsistent testimony to the contrary. *See Combest v. State*, 981 S.W.2d 958, 961–62 (Tex.App.-Austin 1998, pet. ref'd). Appellant was not under arrest or in custody when she consented to give a blood specimen to the police. She was not in a coercive environment, but at a hospital. No physical force or violence was used to obtain appellant's consent. She was cooperative with the police. The officer did not claim to have, or threaten to obtain, a search warrant. Only one officer was at the hospital. Appellant makes no claims that she was unaware of her constitutional rights or that she was immature, uneducated, or unsophisticated. While the consent given was not written, oral consent is sufficient. *See, e.g., Jackson v. State*, 968 S.W.2d 495, 499 (Tex.App.-Texarkana 1998, pet. ref'd). Furthermore, the testimony of Wellman and Officer Carpenter shows that appellant was alert and oriented at the scene and upon her arrival at the hospital.

The trial court's rulings on this issue show that it believed the police officer's testimony and disbelieved appellant's. Deferring, as we must, to the trial court's credibility determinations and to the historical facts impliedly found by the trial court when it denied appellant's motion to suppress, we hold that the trial court did not abuse its discretion by concluding appellant's consent was voluntary and by denying her motion to suppress.

**B. Scope of Appellant's Consent**

In issue five, appellant also argues that the trial court erred in its "implicit finding regarding the scope of consent," claiming that the scope of consent was exceeded since a hospital nurse actually drew appellant's blood and then handed the sample to the officer without appellant's consent to turn over the sample to the police. Similarly, in issues six and eight,[4] appellant alleges the trial court erred by finding that no constitutional or statutory violation occurred when the hospital released or Officer Carpenter seized the sample.[5] Both parties agree that the resolution of this issue does not turn on an evaluation of credibility and demeanor of witnesses, and it should therefore be reviewed de novo. *See Guzman*, 955 S.W.2d at 89.

 The standard for measuring scope of consent under the Fourth Amendment is that of "objective" reasonableness. *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991). In other words, "what would the typical reasonable person would have understood by the exchange between officer and the suspect?" *Id.* at 251, 111 S.Ct. 1801. Finally, suspects are free to limit the scope of the consent they give. *Id.* at 252, 111 S.Ct. 1801.

 The State submits, and we agree, that when a patient who has been involved in a traffic accident is asked by a police officer in a hospital to provide a blood sample, consent for the sample reasonably contemplates using the blood to investigate the cause of the accident or offense related to the accident. Moreover,

4. In issue eight, appellant also challenges the disclosure of her medical records to the State by the hospital. Therefore, we continue our discussion and dispose of issue eight in its entirety in Section VI.

5. U.S. Const. amend. IV; Tex. Const. art. I, § 9; TEX. OCC. CODE ANN. § 159.003(b), .005(a) (Vernon 2004).

before appellant gave consent in this case, the officer asked appellant what caused the accident, and appellant answered that she had been drinking vodka tonics and that the accident happened because she was "too drunk." Finally, there is no evidence that appellant limited the scope of her consent.

Using the reasonable person standard, we hold that the officer could obtain and analyze the first blood specimen without exceeding the scope of appellant's consent. Moreover, since appellant had previously consented to providing the specimen to police, additional consent by appellant to have the nurse hand the specimen to the officer was not required. Therefore, having found the trial court did not err in holding that appellant voluntarily consented to giving a blood sample to Officer Carpenter and that neither Officer Carpenter nor the hospital exceeded the scope of appellant's consent, we overrule appellant's fifth and sixth issues.

## V. CONSENT TO MEDICAL TREATMENT

In issue seven, appellant contends the trial court erred in ruling that the drawing of a sample of appellant's blood by hospital personnel,[6] without appellant's consent to accept medical treatment, did not constitute an assault upon appellant, which would require suppression of the blood draw under Article 38.23(a) of the Texas Code of Criminal Procedure.[7] In challenging this finding, appellant relies on *Hailey*

v. State, 50 S.W.3d 636, 640 (Tex.App.-Waco 2001), *rev'd on other grounds*, 87 S.W.3d 118 (Tex.Crim.App.2002), *cert. denied*, —— U.S. ——, 123 S.Ct. 2218, 155 L.Ed.2d 1111 (2003). In *Hailey*, the Waco court held that the results of a blood test taken by a hospital without the defendant's permission should have been suppressed under Article 38.23 because taking the specimen was an assault under both criminal and civil law. *Id.* at 640.

There, the defendant was not physically injured following a one-car accident, but after the defendant failed a horizontal gaze nystagmus test, exhibited signs of intoxication, and took a portable breath test,[8] a Department of Public Safety officer decided the defendant was highly intoxicated. *Id.* at 637–38. According to standard procedure, the officer would have arrested the defendant and taken him to jail; however, he ordered his fellow officer to transport the defendant to a nearby hospital for an evaluation of whether he had alcohol poisoning. *Id.* at 638. At the hospital, the defendant refused to consent to a blood draw at the officer's request. *Id.* Sometime later, when the defendant walked outside and smoked a cigarette, the officer, who had transported him to the hospital, retrieved him and handcuffed him to a bed in a hospital room. *Id.* Later, an unidentified hospital employee came into the room and took a sample of appellant's blood without obtaining his oral or written consent. *Id.* The officers testified that they did not order the sample taken, and no evidence was offered to contradict their

---

**6.** Since appellant does not specify which of the hospital's two draws she is referring to, addresses only the second draw in her discussion of this issue, and previously raised the voluntariness of consent in regard to the first blood draw, we will only address appellant's consent to the hospital's second draw.

**7.** Article 38.23(a) reads in part,

No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

**8.** The results of the test were not offered at trial. *Id.* at 638 n. 1.

testimony. *Id.* The hospital tested the sample three days later, and the results showed the defendant was highly intoxicated. *Id.* The State subpoenaed the results, which it used at the grand jury and introduced at trial. *Id.*

In *Hailey*, the court noted that, "there [was] no evidence in the record that [the defendant] ever requested or consented to any tests or withdrawals of fluid specimens or to the evaluation and treatment of any condition." *Id.* at 638. In a footnote, the court concluded, "It is axiomatic that if there was consent to or a request for treatment, any complaint by [the defendant] that blood was taken illegally would be negated." *Id.* at 639 n. 6.

The San Antonio Court of Appeals recently addressed the same issue in *Spebar v. State*, 121 S.W.3d 61, 63 (Tex.App.-San Antonio, 2003, no pet.). In that case, a Texas Department of Public Safety trooper found the defendant trapped inside his overturned vehicle. *Id.* slip op. at 2, 2003 WL 22047623 at *1. The trooper testified that there was a strong odor of alcohol on the defendant, the defendant's eyes were red and glassy, his speech was slurred, and he appeared to be intoxicated. *Id.* Although the defendant was severely injured, the trooper did not think he was dying. *Id.* Once removed from the vehicle, the defendant was taken by helicopter to a nearby hospital. *Id.*

An hour later, the trooper met the defendant at the hospital and attempted to obtain his consent to submit to a blood draw. *Id.* at 62. The defendant refused, but admitted he consumed a six-pack of beer throughout the day of the accident. *Id.* The defendant also stated he thought his accident occurred because he had a heart attack. *Id.* The defendant did not sign the hospital's Consent for Treatment and Conditions for Admission. *Id.* However, the defendant's wife signed the hospi-

tal's consent form, although defendant testified he did not give her permission to do so on his behalf. *Id.* At some point, medical personnel drew and tested the defendant's blood for medical purposes. *Id.* The trooper later obtained the results of the blood test, through a subpoena duces tecum, and the results indicated that the defendant had a blood alcohol content that exceeded the legal limit. *Id.* Charges were later filed against the defendant, and following the denial of his motion to suppress, the defendant pled guilty to driving while intoxicated. *Id.*

The court held that the facts of *Spebar* were distinguishable from those in *Hailey* and that the trial court's conclusion that the blood sample was taken as a result of emergency medical treatment and not an illegal assault on the defendant was not an abuse of discretion. *Id.* at 64. In discussing the facts in the record, the court pointed out that:

> [a]lthough [the] defendant established he refused to give [the trooper] his consent for a blood sample, [he] presented no evidence surrounding the actual taking of his blood by hospital personnel, which apparently occurred sometime after [the trooper] left the hospital. In fact, no evidence was presented explaining the events that followed [the trooper's] leaving the hospital, other than that [the] defendant's condition was stabilized. Although [the] defendant said he did not give his wife permission to sign the hospital consent form on his behalf, no evidence was offered to explain why his wife signed the form.

*Id.* at 64.

 We also find *Hailey* distinguishable from this case on its facts and follow the reasoning set out in *Spebar*. Here, the trial court held in its findings of fact that:

[Appellant] was conscious, alert and able to communicate to the hospital personnel treating her for her injuries. No written consent for treatment was obtained prior to the hospital rendering care to [appellant] but consent can be inferred from the medical records and evidence presented. The evidence does not show that the hospital staff committed an assault on [appellant].

Although there is direct evidence establishing that appellant consented to providing a blood sample to the officer, there is also sufficient evidence supporting the trial court's finding that appellant's consent to medical treatment at the hospital can be inferred. As noted above, the testimony of Wellman and Officer Carpenter indicated that appellant was alert and oriented at the hospital. Wellman testified that at the scene, appellant expressed a desire for medical treatment and a desire to go to the hospital; however, appellant did not recall talking to Wellman and testified that he should have left her trapped in her car at the scene. On cross-examination, appellant admitted she "perhaps" wanted the hospital to tend to her injuries and testified that she never refused medical treatment. On the informed consent form contained in the medical records, the notation "multiple injuries unable to sign" appears in the space for the patient's signature and the initials "H.E." appear on the witness line. Like *Spebar*, no evidence was presented explaining the events surrounding the second blood sample draw from appellant, and no evidence was offered to identify "H.E."

Based on this record, we do not believe the trial court abused its discretion in denying appellant's motion to suppress on the grounds that appellant's blood sample was illegally obtained as a result of an assault by hospital personnel. We overrule appellant's seventh issue.

## VI. EXPECTATION OF PRIVACY IN MEDICAL RECORDS

In issues one and four, appellant claims that the trial court erred in ruling that appellant did not possess an expectation of privacy in her medical records under the federal and state constitutions and state statutory law.[9] Similarly, in issue eight, appellant complains the trial court erred in ruling that the hospital's disclosure of appellant's medical records to a police officer, without appellant's written consent, did not violate Chapter 159 of the Texas Occupation Code.

### A. Constitutional Expectation of Privacy

Appellant asserts that she had a constitutional expectation of privacy in medical records containing results of blood-alcohol tests created by a private hospital in the course of emergency medical treatment and later submitted to the police in response to a subpoena. While appellant appears to concede that *State v. Hardy*, 963 S.W.2d 516, 523–27 (Tex.Crim.App. 1997), decided this issue against her position, she argues that the *Hardy* decision has been overruled by the United States Supreme Court in *Ferguson v. City of Charleston*, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001).

In accordance with *Hardy*, the trial court, in its conclusions of law, stated that appellant "had no reasonable expectation of privacy ... in the medical records documenting her medical condition and alcohol

---

**9.** *See* U.S. Const. amend. IV; Tex. Const. art. I, § 9; TEX. OCC. CODE. ANN. § 159.002(b), .003(b)-(c), .005(a).

level from the motor vehicle accident." In *Hardy,* the Texas Court of Criminal Appeals held:

> We express no opinion concerning whether society recognizes a reasonable expectation of privacy in medical records in general, or whether there are particular situations in which such an expectation might exist. We note only that, given the authorities discussed, whatever interests society may have in safeguarding the privacy of medical records, they are not sufficiently strong to require protection of blood-alcohol test results from tests taken by hospital personnel solely for medical purposes after a traffic accident.

963 S.W.2d at 527.

At issue in *Ferguson* was a policy implemented by a state hospital, police, and local officials to obtain evidence that could be used to prosecute women who bore children that tested positive for drugs at birth. *Ferguson,* 532 U.S. at 69–73, 121 S.Ct. at 1282–85. Under the policy, the state hospital, in connection with the police, tested urine samples of the patients suspected of using drugs without their consent or knowledge. *Id.* at 70–73, 1284–86. However, both *Hardy* and the instant case do not involve a policy similar to the one addressed in *Ferguson.*

Here, appellant does not contend that the hospital took the second sample of her blood at the behest of the State or pursuant to any State-sponsored program or policy. Nor does appellant contend the blood test results were provided to the State pursuant to any State-sponsored program or policy. The State obtained the results when it subpoenaed appellant's medical records. The trial court determined in its findings of fact that the blood was drawn during the course of medical treatment according to the orders of a physician for medical testing and that the hospital personnel tending to the defendant were not acting as agents of law enforcement.

 Under these differing facts, the holding in *Ferguson* cannot properly guide the resolution of appellant's constitutional challenges. *See Spebar,* at 65 (citing *Hardy* to show that because the record established that the hospital personnel were not acting as state agents when blood was drawn and analyzed, the constitutional error implicated in *Ferguson* was not present); *Garcia v. State,* 95 S.W.3d 522, 526–27 n. 1 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (following the holding of *Hardy* after the *Ferguson* decision and applying *Hardy* to the appellant's challenge under the Texas Constitution); see *also Alvarez v. State,* No. 03–01–00532–CR, 2002 WL 463278, at *2–*3 (Tex.App.-Austin, March 28, 2002, no pet.) (not designated for publication) (noting, without reaching the merits of the appellant's claim, the inapplicability of *Ferguson* to a case with facts similar to those in the present case). Moreover, absent any guidance or instructions from the court of criminal appeals, we are compelled to follow existing case law. *Tapp v. State,* 108 S.W.3d 459, 463 (Tex.App.-Houston [14th Dist.] 2003, no pet. h.). We therefore overrule appellant's first issue.

**B. Statutory Expectation of Privacy**

Again, contrary to *Hardy,* appellant asserts she had a statutorily-based expectation of privacy in her medical records that should have prevented the records from being seized by the State or relinquished by hospital personnel. Appellant concedes that the *Hardy* decision expressly held that a patient has no statutory privacy interest in medical records created during treatment following an automobile accident since evidence Rule 509 resulted in the

repeat of former Section 5.08 of the Texas Revised Civil Statutes, now chapter 159.003 of the occupation code, to criminal matters. *Hardy*, 963 S.W.2d at 519–23. However, appellant argues that after the adoption of Rule 509, but before the decision in *Hardy*, the legislature manifested an intent to legislate the manner in which medical records are disclosed by hospitals. In other words, appellant claims the amendment to the Medical Practices Act indicated the legislature's intent to "unrepeal" section 5.08, now 159.003 of the occupation code, as it relates to criminal proceedings.

Appellant focuses on an amendment to the Medical Practices Act enacted in 1995 when the legislature added language concerning a court order or subpoena: "(a) An exception to the privilege of confidentiality in a court or administrative proceedings exists ... (12) to a court or a party to an action under a court order or court subpoena." TEX. OCC. CODE ANN. § 159.003(a)(12). Appellant claims that in *Hardy*, which was handed down in 1997, the court of criminal appeals limited its consideration of the Medical Practices Act to the terms of the statute as it existed on December 7, 1992, the date the medical records in that case were seized. Act of May 26, 1983, 68th Leg., R.S. ch. 511, § 1, sec. 5.08(g)(6), 1983 Tex. Gen. Laws 2970, 2971 (current version at TEX. OCC. CODE ANN. § 159.003(a)(12)). Appellant relies on Judge Baird's dissent to the denial of rehearing in *Hardy* to make the argument that the *Hardy* court did not consider the effect of the 1995 amendment to section 5.08, which includes the repealed language. *Hardy*, 963 S.W.2d at 531–32. Appellant argues this shows a legislative intent to override the repeal of the statute as to criminal proceedings and reinstate

the more restrictive requirements of the statute. Judge Baird's dissent to the denial of rehearing indicates that the court did not consider the 1995 amendments (although he declines to say whether the other members of the court were aware of it) and its effects on the repeal of 5.08. *Id.*

■ However, even if the *Hardy* court did not consider the 1995 amendments, appellant does not explain how regulating the "manner of disclosure" overrules *Hardy* and restores a reasonable expectation of privacy in medical records created by a private hospital for medical purposes following a traffic accident. Instead, it is clear from a reading of the plain language of the current version of 159.003(a)(12) that this Section is permissive rather than restrictive. TEX. OCC. CODE ANN. § 159.003(a)(12). In other words, the statute does not dictate only one "manner of disclosure" as appellant argues, but if the information is obtained pursuant to court order or subpoena, it is excepted from confidentiality or privilege; however, information subject to the other exceptions in the statute does not necessarily have to be obtained by court order or subpoena. Therefore, relying on *Hardy*, we must overrule appellant's first, fourth, and eighth issues.

## VII. SUBPOENA DEFECTS

■ In issue two, appellant contends the trial court ruled in error that medical records obtained by an ordinary subpoena following a prior allegedly illegal seizure based on a grand jury subpoena were admissible under the "independent source doctrine." Appellant argues that this doctrine is not an exception under Article 38.23 of the Texas Code of Criminal Procedure.[10] In issue three, appellant contends

---

10. The trial court explicitly declined to rule that this doctrine applied to appellant's suppression issue. Rather, the court held that information concerning the allegedly illegal

the trial court erred when it failed to rule that the allegedly illegal grand jury subpoena violated her rights under the federal and state constitutions.[11] The law is clear that because appellant has no constitutional or statutory reasonable expectation of privacy with respect to blood-alcohol test results obtained for medical purposes following an accident, she has no standing to complain of any alleged defects in the subpoena process. *Tapp*, 108 S.W.3d at 461; *Garcia*, 95 S.W.3d at 526–27; *Hardy*, 963 S.W.2d at 527; *Dickerson v. State*, 965 S.W.2d 30, 31 (Tex.App.-Houston [1st Dist.] 1998), *pet. dism'd, improvidently granted*, 986 S.W.2d 618 (Tex.Crim.App. 1999). We therefore overrule appellant's second and third issues.

## VIII. CONCLUSION

Having overruled all of appellant's issues on appeal, we affirm the trial court's judgment.

**11.** *See* U.S. Const. amend. IV; Tex. Const. art. I, § 9.

grand jury subpoena was not relevant to an issue before the court since the State had no intention of introducing evidence obtained from the grand jury subpoena.