NUMBER 13-04-114-CR

 

                         COURT OF APPEALS

 

               THIRTEENTH DISTRICT OF TEXAS

 

                  CORPUS CHRISTI - EDINBURG

 

 

 

THE STATE OF TEXAS,                                             Appellant,

 

                                           v.

 

EVON
KELLY,                                                           Appellee.

 

 

 

             On appeal from the County
Court At Law No. 4

                           of Nueces
County, Texas.

 

 

 

                              O P I N I O N

 

                    Before Justices Rodriguez,
Castillo, Garza

                           Opinion by Justice Castillo

 








The trial court
granted appellee Evon Kelly's pretrial motion to suppress blood-alcohol test
results from blood extracted for purposes of medical treatment.  The State of Texas appeals from that ruling.[1]  We reverse and remand.

I.  FACTS[2]

On or about March 5,
2001, Kelly was operating a motor vehicle on a public roadway.  Her minor son was a passenger in the back
seat of the vehicle.  Kelly turned left
after stopping at an intersection and collided with an oncoming vehicle.  The child was ejected.  Both Kelly and her son were transported for
emergency medical treatment.  The two
occupants from the other vehicle were similarly transported for emergency
treatment.  At the emergency room, a
phlebotomist drew blood for purposes of Kelly's medical treatment.  Police officers contacted Kelly at the
hospital and smelled a strong odor of alcohol. 
When police officers requested a blood specimen, she refused.  Pursuant to a grand jury subpoena, the blood
test results were secured.  The results
showed a blood-alcohol concentration above the legal limit of .08.[3]  The State subsequently charged Kelly with the
offense of driving while intoxicated.  








Our review of the
record shows that the State filed a rule 902(10) notice of its intent to offer
business records by affidavit.  See
Tex. R. Evid. 910(10).  A certified copy of Kelly's hospital records
are attached to the motion.  Kelly
responded by filing a motion to suppress evidence of the blood test results,
asserting as grounds that the blood was drawn without her effective and
informed consent.  The trial court
convened an evidentiary hearing on Kelly's motion to suppress.  Kelly and the hospital employee who extracted
the blood, Don Gosson, testified.  Kelly
denied she consented to the extraction of her blood, admitted she consented,
and then denied consent.  Gosson
testified that Kelly consented and, had she not consented, he would not have
drawn blood.  The trial court requested
additional briefing.  The parties
complied.  The trial court granted the
motion to suppress, thus, ruling the evidence inadmissible at trial.  This appeal ensued.

II.  STANDARD OF REVIEW








A motion to suppress is a specialized objection to
the admissibility of evidence.  Morrison
v. State, 71 S.W.3d 821, 826 (Tex. App.BCorpus
Christi 2002, no pet.) (citing Galitz v. State, 617 S.W.2d 949, 952 n.10
(Tex. Crim. App. 1981) (op. on reh'g) (en banc)).  Kelly espouses the well-settled bifurcated
standard of review in Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim.
App. 1997) (en banc).  Guzman
instructs that the relevant standard of review depends on the type of question
presented.  Id.; Pena v. State,
61 S.W.3d 745, 752 (Tex. App.BCorpus Christi 2001,
no pet.).  We afford almost total deference
to the trial judge's determination of questions of historical facts supported
by the record, especially those facts based on an evaluation of credibility and
demeanor.  Pena, 63 S.W.3d at
752.  We apply the same standard when
reviewing the trial judge's rulings on "application of law to fact
questions," also known as "mixed questions of law and fact,"
where the resolution of those ultimate questions turns on an evaluation of
credibility and demeanor.  Id.  When considering "mixed questions of law
and fact" which do not turn on an evaluation of credibility and demeanor,
de novo review is appropriate because the trial judge is not in an appreciably
better position than the appellate court to decide the issue.  Id. 
Most reviews of motion to suppress cases will be under a bifurcated
standard, in which the historical determination made by the trial court will be
accorded total deference while the application of the law to the facts will be
analyzed under a de novo standard of review. 
State v. Ross, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000) (en
banc). 

In the absence of
explicit fact findings, we assume that the trial court's ruling is based on
implicit fact findings supported in the record.  See Carmouche v. State, 10 S.W.3d
323, 332 (Tex. Crim. App. 2000) (recognizing implicit fact findings); Ross,
32 S.W.3d at 855; Perales v. State, 117 S.W.3d 434, 437 (Tex. App.BCorpus Christi 2003,
pet. ref=d).  We then review de novo whether the facts,
express or implied, are sufficient to provide legal justification for admitting
the complained-of evidence.  See
Morrison, 71 S.W.3d at 827 (citing Garcia v. State,
43 S.W.3d 527, 530 (Tex. Crim. App. 2001)).    








We uphold a trial
court's ruling on a suppression motion if it is reasonably supported by the
record and is correct on any theory of law applicable to the case. Villarreal
v. State, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996) (en banc); Perales,
117 S.W.3d at 438.  This is true
even if the decision is correct for reasons different from those espoused by
the trial court.  Romero v. State ,
800 S.W.2d 539, 543 (Tex. Crim. App. 1990) (en banc). 

III.  DISCUSSION

By one issue, the
State asserts that the trial court abused its discretion in suppressing
blood-alcohol test results.  The State
obtained the results pursuant to a grand jury subpoena of Kelly's medical
records after a traffic accident.  The
State maintains there is no reasonable expectation of privacy as to the
results.  Kelly counters that the trial
court properly suppressed the evidence because the results were obtained
without a valid search warrant, a court order, or Kelly's effective consent. 








We address first Kelly's
contentions that the results are properly excluded in the absence of a valid
search warrant and a court order. 
Generally speaking, taking a blood sample is a search and seizure within
the scope of the Fourth Amendment to the United States Constitution and article
I, section 9 of the Texas Constitution. Schmerber v. California, 384
U.S. 757, 767 (1966); Aliff v. State, 627 S.W.2d 166, 169 (Tex. Crim.
App. 1982).  Kelly based her complaint on
the three following grounds:  (1) the
initial blood draw was performed in violation of the law because she did not
consent;[4]
(2) she was assaulted; and (3) the results were illegally disclosed to law
enforcement officers.[5]  Because the blood extraction did not involve
police conduct, the Fourth Amendment search and seizure principles were not
implicated.[6]  See Clark v. State, 933 S.W.2d 332,
333 (Tex. App.BCorpus Christi 1996,
no pet.); see also St. Clair v. State, 26 S.W.3d 89, 102 (Tex. App.BWaco 2000, pet. ref=d); State v. Hurd,
865 S.W.2d 605, 606‑07 (Tex. App.BFort Worth 1993, no
pet.); Weaver v. State, 721 S.W.2d 495, 498 (Tex. App.BHouston [1st Dist.]
1986, pet. ref=d).  

Similarly, the absence
of consent for emergency care is not required if a court of record orders the
treatment of an individual who is in an imminent emergency to prevent the
individual's serious bodily injury or loss of life.  Tex. Health & Safety
Code Ann. _ 773.008(2) (Vernon 2003).  Kelly did not assert to the trial court this
theory in support of her motion to suppress. 
We do not address it on appeal.  See
Hailey v. State, 87 S.W.3d 118, 120-22 (Tex. Crim. App. 2002).  Accordingly, in the context of the sole issue
before us, we conclude that the absence of a search warrant or a court order
are not theories of law applicable to the case before us.  See Villarreal,  935 S.W.2d at 138. 








Illegally obtained
evidence, whether procured by private individuals or by police officers, is
strictly inadmissible in Texas criminal proceedings under article 38.23.  See Tex.
Code Crim. Proc. Ann. art. 38.23(a) (Vernon 2005).[7]  The article applies to private citizens.  State v. Johnson, 939 S.W.2d 586,
587-88 (Tex. Crim. App. 1996) (en banc). 
Thus, if Kelly's blood was taken in violation of any state or federal
law or constitutional provision, not only the blood but also the results of the
blood test would be properly suppressed. 
See id. at 588; Johnson v. State, 871 S.W.2d 744, 750
(Tex. Crim. App. 1994); Bell v. State, 724 S.W.2d 780, 787 (Tex. Crim.
App. 1986).  We turn to the opposing
theories the parties presented to the trial court: (1) no reasonable
expectation of privacy, and (2) lack of consent.  See Hailey, 87 S.W.3d at 120-22.  While the evidence in the present case was
disputed, we conclude that the issue to be decided did not turn on credibility
or demeanor.  Accordingly, we will grant
almost complete deference to the trial court's finding of the historical facts
and review de novo the application of the law to the facts.  Pena, 61 S.W.3d at 752.

A.  No Reasonable Expectation of Privacy








As the State correctly
asserts, the Court of Criminal Appeals has held that an accused does not have a
legitimate expectation of privacy in medical records containing blood‑alcohol
test results "taken by hospital personnel solely for medical purposes
after a traffic accident."  State
v. Hardy, 963 S.W.2d 516, 527 (Tex. Crim. App. 1998).  The State argues, that the evidence of
Kelly's blood-alcohol concentration contained in the medical record was duly
obtained pursuant to a grand jury subpoena. 
Thus, says the State, the record is admissible. 








The parties do not dispute
that Kelly's blood was drawn solely for medical purposes.  Our review of the record reaches the same
conclusion.  Accordingly, we conclude
that Kelly does not have a legitimate expectation of privacy in her blood‑alcohol
test results.  Hardy, 963 S.W.2d
at 527; Clark, 933 S.W.2d at 333. Because the Fourth Amendment does not
confer a reasonable expectation of privacy under these circumstances, Kelly has
no grounds to complain of an unreasonable search or seizure under the Fourth
Amendment.  See Weaver, 721
S.W.2d at 498; see also Spebar v. State, 121 S.W.3d 61, 65 (Tex. App.BSan Antonio 2003, no
pet.) (holding that constitutional error is not implicated where the record
does not establish hospital personnel were acting as state agents for law
enforcement purposes when the blood was drawn and analyzed).  Kelly has not challenged the grand‑jury
subpoena process.[8]  See Garcia v. State, 95 S.W.3d 522,
526‑27 (Tex. App.BHouston [1st Dist.]
2002, no pet.); Dickerson v. State, 965 S.W.2d 30, 31 (Tex. App.BHouston [1st Dist.]
1998, pet. dism'd, improvidently granted). 
We conclude that the medical record, including the blood-test results,
would be admissible under the theory that Kelly has no expectation of privacy
under Hardy.[9]  However, our inquiry does not end here.  Kelly complains that the tests results were
rendered inadmissible under article 38.23(a) of the code of criminal procedure
because the blood was illegally obtained by a person (not an officer) in
violation of the following laws of the State: 
(1) the Texas Penal Code, governing assault; and (2) the Texas Health
and Safety Code, governing consent for medical treatment.  Thus, we must consider admissibility under
article 38.23(a).  See Tex. Code Crim. Proc. Ann. art. 38.23
(Vernon 2005).    

B.  Lack of Consent

Essentially, Kelly
asserts that the absence of her "effective consent" is fatal to the
admissibility of the test results.  She
asserts that her blood was drawn in violation of the law and, thus, the test results
were properly suppressed as inadmissible under 
article 38.23.  Id.  We turn to the testimony adduced at the motion
to suppress hearing. 

1.  The Record

Two witnesses
testified at the hearingBKelly and the
phlebotomist who drew the blood.  Kelly
testified first on direct examination:

Q:  Did they ever ask you for consent to do that
[draw blood]?

 

A:  Not that I recall, no.

 

Q:  When they drew the sample, were you
conscious?

 

A:  Yes, I was. 








Q:  Were
you aware of your circumstances?

 

A:  Yes.

 

Q:  Were
you able to answer questions of people who were treating you?

 

A:  Yes.

 

Q:  Do you
recallBany person asking you
whether or not you gave consent or approval for the blood draw?

 

A:  No, I
do not.

 

Q: 
Okay.  And did you consent to the
blood draw?

 

A:  No.

 

Q:  Were
you ever presented aBany documentation so
that you could consent?

 

A:  No.

 

Q:  You
were given documentation to consent to a surgical procedure that happened
sometime later at your stay at the hospital, is that correct?

 

A:  Yes. 

 

Q:  Do you
remember the blood draw?

 

A:  Yes, I
do.

 

Q:  Did it
hurt you?

 

A:  Yes.

 

Q: 
Okay.  Caused you physical pain?

 

A:  Yes.

 








Q:  Did you
ever give your husband consentBpermission to consent
to medical treatment for you?[10]

 

A:  No.

 

Q:  And, in
particular, the blood draw?

 

A:  No.

 

On cross-examination
by the prosecutor, Kelly testified as follows:

 

Q:  Mrs.
Kelly, did you ever object to any treatment you had received that day?

 

A:  No.

 

Q:  Was
your husband present in the room with you that day?

 

A:  For
part of the time, yes.

 

Q:  Okay.  Was he present when they drew the blood?

 

A:  I do
not believe so.

 

Q:  But he
could have been present, is that correct?

 

A:  That's
true. . . . 

 

Q:  Do you
know the time that your husband was present in your hospital room with you didBat any time did you
hear your husband object to any treatment that was being provided by the
personnel at Spohn?

 

A:  No.

 








Q:  How
many times did they draw your blood, if you recall?

 

A:  I do
not recall that.

 

Q:  Could
it have been more than once?

 

A:  I
believe it was only one time.

 

Q:  Are you
claiming then that you were assaulted by someone because you did not give
consent?

 

A:  Yes. .
. .

 

Q:  Was it
a male or a female who took the blood from you, ma'am?

 

A:  I do
not really recall.  There were several
people around me at that time. 

 

Don Gosson, the emergency room technician/phlebotomist, testified
that, on May 5, 2001, one of his duties was to draw blood.  On that day, Kelly was "in a trauma
situation . . . she had a C-collar on her, and she was on a back board, and she
was restrained, so she was given priority."  He testified that Kelly was conscious and
able to talk to him.  He received orders
to draw blood on meditech.  He further
testified:  

Q:  As far
as meditech, can you explain what meditech is?

 

A:  It's
just a series of medical orders or medical blood draw requests that come
in.  It's likeBit's a series of
orders that comes out that we use to obtain the type of blood draw that is
requested.

 

Q:  That's
used at the . . . direction of the hospital?

 

A: 
Correct.

 

Q:  And
it's in no way related to the police department . . . or their investigation?








A:  No.

 

He
testified that a police officer did not tell him to draw the blood.  He testified he asked Kelly for her consent
to draw blood:

Q:  Did you
obtain that consent?

 

A:  I
obtained her consent.

 

Q:  She
didn't tell you, "No, you can't have my blood?"

 

A:  I
wouldn't have drew it. . . .  She didn't
tell me no.

 

Q:  If she
had told you you can't draw her blood you indicated you wouldn't have done
it.  What would you have done after that?

 

A:  If she
had stated that I could not obtain her blood from her I would have told her
that's okay.  I wouldn't have drew her
blood.  I would have left.  I would have reported that to the nurse and,
you know, that's all I can do.

 

Q:  But in
this case she didn't tell you?

 

A:  No, I
wouldn't have drew her blood.

 

On cross-examination,
Gosson testified:

 

Q:  And
that's what she did in this case, was she acquiesced to what you told her you
were there to do?

 

A: 
Correct.

 

Q:  And you
went in, you told her, "I'm here to draw your blood" and you put the
band on her arm and she didn't fight, right?

 

A: 
Correct.

 

Q:  She
didn't struggle with you?

 

A:  No.

 








Q:  She
didn't yank her arm back and say, "No you can't do that?"

 

A:  No sir.
. . .

 

Q: 
Okay.  Do you have any knowledge
whether or not she signed a consent to treat?

 

A:  I
don't.

 

Q: 
Okay.  And that's not your primary
concern when you're in there.  You're not
worried about whether she consents.  In
fact, you presume that if she is there she is consenting to the treatment of
the hospital, isn't that correct?

 

A:  Well,
only if she gives me permission. . . .

 

Q:  And
you're interpreting that lack of refusal to be consent?

 

A:  Yes,
sir.

 

Questioning of Gosson
by the prosecutor continued as follows:

 

Q:  You
said that she was aware of her surroundings?

 

A:  I
didn't ask her for person, place, or time. 
I didn't try to establish her conscious level, but she was conscious
enough to give consent. . . .

 

Q:  Do you
wait until the consent to treat form is signed before you proceed with any kind
of emergency medical treatment for the patient?

 

A:  No,
sir.  

 

Q: 
Okay.  Do you generally receive
consent orally?

 

A:  If the
patient is conscious and awake and alert then we can ask the patient, "Is
it okay if we draw some blood?"

 

Q:  Was she
conscious, awake, and alert?

 

A:  Yes,
sir.

 

The defense re-called Kelly. 
She denied that Gosson asked permission to draw 








blood.  She further testified:

Q:  As a matter of fact, when somebody gave you
the choices as to whether or not you would allow a blood draw or not you
refused, is that correct?

 

A:  Yes, I did.

 

Q:  And that came when the police officer after
this blood draw came and told you that . . . they wanted a blood draw and that
you had a right to either consent or refuse, is that right?

 

A:  That's right.

 

Q:  And at that point once you were given a choice
you refused, is that correct?

 

A:  Yes, I did.

 

In turn, the State
focused its re-cross-examination on grounds of self-serving testimony, and
Kelly testified:

Q:  It's in your case's best interests to say
today that you didn't give consent, is that correct?

 

A:  No.

 

Q:  Okay. 
You understood . . . officers came in and asked you whether or not they
could take a blood sample from you, is that correct?

 

A:  Yes, they did.

 

Q:  And they read to you what's called the
DIC-24.  Do you remember them reading a
form to youB

 

A:  I do remember.

 

Q:  And in that particular case you did refuse?

 

A:  Yes, I did.

 








Q:  But
you're saying you didn't understand what the gentleman here, Mr. Gosson, was
explaining to you with respect to the blood draw?

 

A:  He
didn't explain anything to me.

 

Q:  What is
your recollection of what happened when he walked into the room?

 

A:  My
recollection is he said, "I'm here to take your blood."  And . . . there were people doing all kinds
of things.  I was horizontal.

 

Q: . . . And when he says, "I'm here to take
your blood," did you say to Mr. Gosson "Not a chance?"

 

A:  No, I
did not.

 

Q:  Did you
tell him under no circumstances did you want him to draw any blood from you?

 

A:  No, I
did not.

 

Q:  And
what's the next thing that he said to you?

 

A:  I
really don=t recall.

 

Q: 
Okay.  And at the time did you
think it would be in your best medical interests to have the blood drawn so you
could be treated by the medical staff?

 

A:  That
was what needed to be done . . . .

 

Q:  Now,
you knew that they needed to draw blood to adequately treat you medically, is
that correct?

 

A:  I did
not know that.  I was just told that the
blood was going to be drawn from me.

 

Q:  And you
consented by not refusing because you knew that was part of your medical
treatment, is that correct?

 

A:  I
consented.

 








Q:  You did
consent?

 

A:  Well, I
put my arm out.

 

On further
questioning by defense counsel, Kelly subsequently denied she consented. The
defense argued that Kelly did not consent to the blood draw, the blood draw was
an assault, and should not be admitted under article 38.23 of the code of
criminal procedure.   

2.  Disposition   

 

Assault

 

Kelly asserts that because she did not consent to the blood
extraction, she was assaulted.[11]  Section 22.01(a)(1) of the penal code states
that a person commits an assault if he "intentionally, knowingly, or
recklessly causes bodily injury to another."  Tex.
Pen. Code Ann. ' 22.01(a)(1) (Vernon
2003).  The victim's effective consent or
the actor's reasonable belief that the victim consented to the actor's conduct
is a defense to an assault prosecution if (1) 
the conduct did not threaten or inflict serious bodily injury under
section 22.06(1); and (2) the victim knew the conduct was a risk of recognized
medical treatment, under section 22.06(2)(B). 
See Tex. Pen. Code Ann.
_ 22.06(1), (2)(B) (Vernon 2003).  We observe that the provisions of the penal
code must be construed according to the fair import of their terms, to promote
justice and effect the objectives of the code. 
Tex. Pen. Code Ann. _ 1.05(a) (Vernon
2003).  








When the trial court does not make explicit findings
of historical facts, we review the evidence in the light most favorable to the
trial court's ruling.  Morrison,
71 S.W.3d at 827 (citing Walter v. State, 28 S.W.3d 538, 540 (Tex.
Crim. App. 2000)).  Viewed in the light most
favorable to the trial court's ruling, the evidence negates assault.  Even assuming that Kelly did not consent,
Gosson would not have drawn blood if Kelly had not consented.  Thus, he possessed a reasonable belief that
she consented.  Further, the extraction
of blood neither threatened nor inflicted serious bodily injury.[12]  Accordingly, exclusion of the evidence on
grounds of assault is not supported in the record.  See Ramos v. State, 124 S.W.3d 326,
336 (Tex. App.BFort Worth 2003, pet.
ref'd).  Thus, the test results were not
inadmissible under article 38.23. 

Effective Consent

Kelly asserts that
blood was drawn in violation of section 773.008 of the Texas Health and Safety
Code which states:

Consent for emergency
care of an individual is not required if:

(1) the individual is:

(A) unable to
communicate because of an injury, accident or illness or is unconscious; and

(B) suffering from
what reasonably appears to be a life-threatening injury or illness . . . .

 

Tex. Health & Safety
Code Ann.
_ 773.008 (Vernon 2003).

 













Viewed in the light
most favorable to the trial court's ruling, the evidence shows that Kelly was
"conscious and able to communicate" as she asserts.  The evidence reasonably infers that she could
have signed a written consent for treatment. 
Even so, the evidence also establishes that she unequivocally admitted,
under oath, that she consented to the extraction of blood.  Oral consent is sufficient.  See, e.g., Jackson v. State, 968 S.W.2d
495, 499 (Tex. App.BTexarkana 1998, pet.
ref'd).  Further, the objective physical
manifestation of Kelly's consent is established by the admitted extension of
her arm to allow the extraction of the blood. 
Kelly allowed multiple procedures on her person, including bracing her
body for transport and the transportation for the sole purpose of emergency
medical care.  Indeed, these are not
manifestations of a "mere acquiescence of authority."  The blood extraction was solely for medical
purposes.  Consent for the blood sample
reasonably contemplates the use of the blood in furtherance of her emergency
medical diagnosis and treatment.  To
isolate the blood extraction, admittedly done in furtherance of her medical
treatment, and attest in hindsight that it was the sole act she did not consent
to belies the evidence in the case. 
"It is axiomatic that if there was consent to or a request for
treatment, any complaint by [the defendant] that blood was taken illegally
would be negated."  Hailey v.
State, 50 S.W.3d 636, 640 (Tex. App.BWaco 2001), rev'd
on other grounds, 87 S.W.3d 118 (Tex. Crim. App. 2002), cert. denied,
538 U.S. 1060 (2003).  We conclude that
the evidence establishes that Kelly consented to the blood extraction, despite
her inconsistent testimony to the contrary. 
Accordingly, we conclude that Kelly's theory that the alcohol-blood test
results are inadmissible under article 38.23, because she did not consent to
the blood extraction for medical purposes, is not reasonably supported by the
record.  We cannot uphold a trial court's ruling on a suppression motion if it
is not reasonably supported by the record and is not correct on any theory of
law applicable to the case.  See
Villarreal, 935 S.W.2d at138; Perales, 117 S.W.3d at 438.  

IV.  CONCLUSION

We have focused our
review on the sole issue presented: 
whether the trial court abused its discretion by suppressing the test
results under the theory that there is no reasonable expectation of privacy in
medical records showing blood-alcohol test results from tests taken by hospital
personnel for medical purposes after a traffic accident.  Our analysis leads us to one result:  on this record, the ruling to suppress  the test results is not supportable on the
theories Kelly has espoused.  Because the
State's theory finds support in Hardy, 963 S.W.2d at 527, and Clark,
933 S.W.2d at 333, we sustain the State's sole issue.  We reverse the order granting the motion to
suppress and remand.  

 

ERRLINDA CASTILLO

Justice

 

Publish.

Tex. R. App. P. 47.2(b).

 

Opinion delivered and filed

this 30th day of June,  2005.

 











[1] See Tex.
Code Crim. Proc. Ann. art. 44.01(a)(5) (Vernon Supp.
2004-05); Tex. R. App. P.
25.2(a).





[2] Kelly agrees with the State's
recitation of the historical facts but emphasizes facts relevant to her consent
theory.  See Tex. R. App. P. 38.1(f) &
38.2(a)(1)(B).  





[3] See Tex. Pen. Code Ann. ' 49.01(2)(B) (Vernon 2003) ("'Intoxicated' means
having an alcohol concentration of 0.08 or more."). 





[4] Kelly relies on Hailey v. State,
50 S.W.3d 636, 640 (Tex. App.BWaco 2001), rev'd on other grounds, 87 S.W.3d 118
(Tex. Crim. App. 2002), cert. denied, 538 U.S. 1060 (2003) (holding that
the results of a blood test taken by a hospital employee without the
defendant's permission should have been suppressed under article 38.23 because
taking the specimen was an assault).





[5] Kelly does not discuss the third
theory on appeal.  Even so, the testimony
at the hearing does not support the theory. 
The supplemental police report attached to Kelly's trial court brief as
an "exhibit" is not evidence. 
An exhibit not expressly admitted into evidence may be considered as
evidence when the parties and judge treat the exhibit as if it were in
evidence.  See Heberling v. State,
834 S.W.2d 350, 355‑56 (Tex. Crim. App. 1992) (en banc).  There is no showing that the trial court
treated the supplemental police report as if it were evidence.  Nonetheless, the supplemental police report
is not properly authenticated.  Tex. R. Evid. 901(a), 902(4),(10). 





[6] The consent statutes of the Texas
Transportation Code do not apply here. 
The implied consent and refusal to consent statutes of the
transportation code apply only when a person is arrested.  For example, a person is deemed to have
consented to the taking of a breath or blood specimen only if he is arrested for
an offense committed while operating a motor vehicle while intoxicated.  See Tex.
Trans. Code Ann. ' 724.011 (Vernon 2003); Combest
v. State, 981 S.W.2d 958, 960 (Tex. App.BAustin 1998, pet. ref'd). 
Here, Kelly was not arrested prior to her blood extraction.  Because the implied consent statutes do not
apply, we do not determine whether the State proved by clear and convincing
evidence that Kelly voluntarily consented to the taking of her blood, as Kelly
asserts.  See Combest, 981 S.W.2d
at 961.





[7] 
Article 38.23(a) states:

 

No evidence obtained by an officer
or other person in violation of any provisions of the Constitution or laws of
the State of Texas, or of the Constitution or laws of the United States of
America, shall be admitted in evidence against the accused on the trial of any
criminal case.

 

Tex. Code
Crim. Proc. Ann. art.
38.23 (Vernon 2005).  





[8] See Tex.
Occ. Code Ann. ' 159.003(a)(10), (12) (Vernon
2004).





[9] Thus, the trial court could have
properly denied the motion to suppress on grounds of admissibility under rule
910(10).  Tex. R. Evid. 910(10); see Tex. R. Evid. 803(6), (7). 






[10] Although Kelly said she did not
give her husband permission to sign the hospital consent form on her behalf,
she offered no evidence to explain why her husband signed the form.  See Spebar v. State, 121 S.W.3d 61, 64
(Tex. App.BSan Antonio 2003, no pet.).  We observe that the presumed signature of her
husband appears on the consent form, above the notation "PATIENT, MINOR
GUARDIAN OR LEGAL REPRESENTATIVE." 
The Texas Health and Safety Code authorizes a spouse to consent to
medical treatment if the patient-spouse is comatose, incapacitated, or otherwise
mentally or physically incapable of communication.  See Tex.
Health & Safety Code Ann. _ 313.004(a)(1) (Vernon 2001).  

 





[11] Kelly did not raise civil assault
to the trial court.  Thus, we will not
address the theory.  See Hailey v.
State, 87 S.W.3d 118, 120‑22 (Tex. Crim. App. 2002); see also
Knapp v. State, 942 S.W.2d 176, 179-80 (Tex. App.BBeaumont 1997, pet. ref'd)
(discussing various theories that alleged evidence sought to be suppressed was
rendered inadmissible under article 38.23).    






[12] "'Serious bodily injury'
means bodily injury that creates a substantial risk of death or that causes
death, serious permanent disfigurement, or protracted loss or impairment of the
function of any bodily member or organ." 
Tex. Pen. Code Ann. _ 1.07(46) (Vernon 2003).