**Opinion issued August 29, 2024**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-22-00639-CR

———————————

**LUIS MORON ROMERO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 185th District Court**
**Harris County, Texas**
**Trial Court Case No. 1613284**

---

## MEMORANDUM OPINION

A jury found appellant Luis Moron Romero guilty of the felony offense of first-degree murder and sentenced him to confinement for life. In two points of error, appellant contends that the trial court erred by (1) denying defense counsel's request for a jury instruction on the lesser-included offense of manslaughter, and (2) finding

that appellant gave effective consent for the police to obtain a buccal swab to collect his DNA without a warrant. We affirm the trial court's judgment on guilt, but we reverse the trial court's judgment as to punishment and remand the case to the trial court for a new punishment hearing.

## Background

### A.     Guilt-Innocence Phase

In November 2018, Wesley Hernandez worked for Manns Granite, a company owned by Victor Mejia and his wife, Maria Marquez (the complainant). As Marquez's assistant, Hernandez regularly accompanied Marquez to various job sites.

On the morning of November 21, 2018, Marquez drove her green Chevrolet Avalanche to Pearland to finish cleaning up a residential job site. Hernandez did not accompany Marquez on this day but instead traveled with Mejia to help him pick up granite from various companies. Marquez called Mejia around 12:30 p.m. and told him that she planned to stop at the bank before returning to the company.

When Marquez had not returned to the company site by 2:30 p.m., Hernandez and Mejia began calling her repeatedly on her business phone and personal cell phone but were unable to reach her. Eventually Marquez's phones stopped ringing.

By 5:00 p.m., when Marquez had still not returned, Hernandez went to the Pearland job site to look for her. When he arrived, he saw no sign that Marquez had been there and thereafter called the police. Mejia gave Hernandez permission to

access his and Marquez's Google accounts. Based on the information he obtained, Hernandez went to the Tejano Apartments but he was unable to locate Marquez. Hernandez began driving through the surrounding neighborhoods to try and locate Marquez's vehicle. As he drove by Abry Brothers Foundation Repair, a business located about one-half mile from the Tejano Apartments, he saw a patrol car with its emergency lights flashing. Police officers and an ambulance surrounded a green Chevy Avalanche in a ditch off the roadway.

On November 21, 2018, at 5:00 p.m., Alejandro Gallegos picked up his wife, Selena, from Abry Brothers where she worked. After they arrived home, Selena checked Abry Brother's security cameras and noticed that one of the doors was open. When they returned to Abry Brothers, they saw workers leaving and closing the building, so Selena activated the alarm and they left the premises. As they drove away, Alejando saw a truck off the side of a road. He stopped and approached the vehicle. As he looked inside the driver's side window, he saw a shoe sticking up in the air. He and Selena immediately called 911, and police and paramedics arrived on the scene.

A medical examiner arrived and removed a dead body from the vehicle. The deceased victim was later identified as Marquez. She had been wrapped up in a rug bound by wire, and her body had been wedged upside down in the passenger side of the Chevy Avalanche. The vehicle was later towed to a Houston Police Department

(HPD) vehicle examination building where it was processed for evidence, photographed, and swabbed for DNA.

Marquez's body was transported to the Harris County Institute of Forensic Science (HCIFS) where Zury Phillips, a DNA analyst, collected evidence from the body. Philips testified that upon unraveling Marquez's body from the rug, she detected a strong odor of a cleaning solution. Marquez's shirt had been pulled up over her breasts and her pants were pulled down around her ankles. Phillips observed wounds to Marquez's hands and some hair tangled between her fingers. She noted that a gray jacket had been laid over Marquez's face, and her face appeared to have sustained a lot of trauma. Phillips swabbed the wire that had been used to bind Marquez's body in the rug as well as Marquez's legs, hips, pubic area, buttocks, breasts, neck, face, stomach, fingertips, left knuckles, neck and face as well as her underwear, leggings, and jeans for possible DNA evidence.

Dr. Darshan Phatak, an HCIFS Assistant Medical Examiner, conducted an autopsy of Marquez's body. Dr. Phatak determined that the victim's cause of death was blunt force trauma to the head and neck and the manner of death was homicide. Dr. Phatak testified that Marquez's injuries were consistent with being hit with a hammer. He testified that Marquez sustained twenty-one lacerations to her head, resulting in three skull fractures and causing her scalp to split open, as well as multiple lacerations and contusions to her face and neck. Dr. Phatak testified that a

4

large hole had been punctured through Marquez's lower lip and that she had also sustained trauma to her mouth, including fractures to her upper and lower jaw bones, and that several of her teeth had been dislocated. Dr. Phatak also observed lacerations and contusions to Marquez's arms, hands, chest, and left buttock. He testified that the injuries to Marquez's hands were consistent with defensive wounds. Dr. Phalak opined that the attack was violent and that it was possible that the perpetrator could have been in an agitated state or rage when the injuries were inflicted.

HPD Sergeants Jon Stroble and Michael Barrow were assigned as the lead investigators on the case. At the scene, Sergeant Stroble observed a green Chevy Avalanche truck that was located off the service road. When he looked inside, he discovered a body wrapped up in a rug in the passenger seat of the vehicle later identified as that of Marquez.

Sergeant Barrow, who is fluent in Spanish, and Sergeant Stroble interviewed several witnesses at the scene. Sergeant Stroble spoke with Alejandro and Selena. With Selena's assistance, Sergeant Stroble was able to view footage from the surveillance cameras from Abry Brothers on the night in question. The surveillance video was admitted into evidence as State's Exhibit 14. Sergeant Stroble testified that the footage showed what appeared to be Marquez's Chevy Avalanche pass by at approximately 5:55 p.m. on November 21, 2018, and slow down as it passed by

5

the business. He testified that, moments later in the video, an individual wearing a light-colored shirt, dark pants, and white shoes could be seen walking down the service road in the opposite direction from the location of the Avalanche.

In the course of the investigation, Sergeants Stroble and Barrow learned that Marquez's Google account showed the Tejano Apartments, approximately a half-mile from where the Avalanche was found, as her last known location. They canvassed the area for anyone who may have seen Marquez and to determine whether the apartment complex had surveillance cameras. Based on the information they received, Sergeants Stroble and Barrow were directed to Unit 33. The apartment complex manager identified the resident of Unit 33 as "Luis."

When they returned to the complex several days later, they reviewed the footage from the surveillance cameras in the complex. The video showed Marquez arrive at the Tejano Apartments on the afternoon of November 21, 2018, and park near Unit 33. Marquez and a person later identified as appellant could be seen entering Unit 33 together. Sergeant Stroble testified that they later learned that Marquez had been involved in a romantic relationship with appellant for approximately six months. Approximately an hour and a half after appellant and Marquez entered Unit 33, the video footage showed appellant exiting the apartment alone. Appellant then appeared to be checking keys, trying to determine which one would unlock the driver's side door of Marquez's vehicle. The video showed

6

appellant making multiple trips in and out of his apartment and changing his clothes several times.

Sergeant Stroble testified that sometime after sunset, appellant got into Marquez's vehicle and moved it directly in front of Unit 33. The video then showed appellant loading Marquez's body wrapped in the rug into the passenger side of her vehicle. Sergeants Stroble and Barrow obtained an arrest warrant for appellant and a search warrant for his apartment. Upon entry into Unit 33, Sergeant Stroble observed what appeared to be blood inside the bedroom.

Following his arrest, appellant was transported to the police station. Sergeant Barrow read appellant his *Miranda*[1] warnings and interviewed him in Spanish. Sergeant Barrow testified that based on his observations, he believed that appellant knowingly and voluntarily waived the rights read to him.

In his interview, appellant initially denied that he had ever met Marquez and stated only that he may have seen her at a Walmart store. However, after being shown the surveillance footage of him loading Marquez into her vehicle, appellant admitted to having had a romantic relationship with her. Appellant told Sergeant Barrow that Marquez often expressed her frustration about her marriage to him. Appellant stated that he and Marquez were about to have sex when she changed her mind and said she had to leave. Appellant said he became angry, lost his "conscious,"

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

7

and killed Marquez with a hammer. According to appellant, Marquez had begged for forgiveness during the attack and had pleaded with him "Luis, don't do it, Luis!" Appellant told Sergeant Barrow that he bought a mop and cleaner and cleaned up the apartment afterwards. He told Sergeant Barrow that the hammer he used to kill Marquez was at his place of work. Following his confession, a buccal swab of appellant's saliva was collected.

Cassaundra Barnes, an HCIFS supervisor in the latent print section, testified that based on her comparison of appellant's known fingerprints and the latent prints taken from Marquez's vehicle, she determined that one of the fingerprints on the exterior of the Chevy Avalanche belonged to appellant. Appellant's apartment was processed for forensic evidence by Christine Baker, a former HCIFS crime scene investigator. Baker testified that she sprayed BlueStar—a confirmatory test for latent blood—in appellant's apartment and received a positive reaction on the floor, at the foot of the bed, on the nightstand, and at the entryway near the front door. According to Baker, the presence of blood that was not visible indicated that an attempt had been made to clean up the scene.

Jessica Powers, a DNA analyst with HCIFS, analyzed the DNA samples collected from Marquez's vehicle and body and from appellant's apartment. She testified that Marquez could not be excluded as a possible contributor to the major component of a DNA mixture from at least two contributors obtained from a swab

of possible blood on the bottom shelf of the nightstand located at the foot of appellant's bed. She testified that the probability that a randomly chosen unrelated individual would be included as a possible contributor to the major component of the DNA mixture is approximately 1 in 11 septillion individuals. She testified that a single-source female DNA profile was obtained from the plastic box spring cover on appellant's bed, and that the results showed that it was 552 sextillion times more likely to have originated from Marquez than from an unknown, unrelated individual. Powers testified that these results provided "very strong support" for the proposition that Marquez was a contributor to the DNA obtained from the plastic cover. She further testified that the DNA analysis provided "very strong support" for the proposition that appellant contributed to a DNA mixture obtained from swabs of the top area of Marquez's leggings and underwear as well as swabs of the inside of Marquez's legs, pubic area, and hip area. In addition, the DNA analysis provided "strong support" for the proposition that appellant was a contributor to DNA mixtures obtained from swabs of the top area of Marquez's jeans and her neck, and the steering wheel and gear shift of her vehicle. Powers testified that the DNA analysis provided "moderate support" for the proposition that appellant contributed to a DNA mixture obtained from swabs of Marquez's buttocks.

After both sides rested, the jury found appellant guilty of the charged offense of murder.

## B.    Punishment Phase

In the punishment phase of trial, the State sought to prove that appellant had murdered Guillermo Gonzalez. In its opening statement, the prosecutor told the jury, "you'll see a forensic link, a forensic link that you'll find to be unmistakable, back to this defendant and that identified him as the killer for a second time."

In February 2017, Pasadena Police Department (PPD) Officers Jonathan Jernigan and Michael Cooper were assigned to investigate the death of Gonzalez whose body had been left in his car, a Chevy Lumina, at an abandoned carwash. Gonzalez had been stabbed four times—three times in the back and once in the side—and died from multiple sharp force injuries. DNA swabs were taken from Gonzalez's body and the turned-out pockets of his pants, as well as the interior and exterior of his car.

In the course of their investigation, police spoke to several people at a nearby homeless encampment. From the information obtained, police determined that Gonzalez's car had been left at the carwash between 2:15 a.m. and 3:30 a.m. Surveillance recordings obtained from a nearby apartment complex showed a man walking away from the carwash shortly after Gonzalez's car had been left there. The recordings also showed a white Cadillac CTS with a black right front quarter panel circling in the area. One week later, while conducting surveillance of the area, officers observed the same Cadillac drive by.

10

Police arrested the driver of the Cadillac on an outstanding warrant. Officers obtained voluntary buccal swabs from the driver and two other individuals during the course of the investigation. The driver was later ruled out as a suspect because he had a distinctive limp which the man on the surveillance recording did not appear to have as well as disfigurement of his arms and hands which officers believed made him incapable of stabbing or lifting a body. The other two individuals were also ruled out as suspects based on their DNA results.

A hit on the license plate of the Chevy Lumina later led police to an apartment complex near the carwash. Police eventually learned that Gonzalez had lived in an apartment in the complex with several roommates. One of those roommates, Sabu Solis, gave the name "Luis" to police as a person who could be a person of interest. Police canvassed the area for several weeks in an effort to find "Luis" but were unable to locate him.

In December 2018, HPD contacted PPD and provided officers with appellant's name.[2] Officer Cooper testified that he requested appellant's DNA sample so they could compare it to the DNA that had been obtained in their investigation of Gonzalez's murder. Police learned that appellant had been living at an apartment complex located a quarter-mile from the carwash where Gonzalez's body was discovered, and that he and Gonzalez had been co-workers. They also

---

[2] The record is unclear why HPD contacted PPD to provide appellant's name.

11

learned that Gonzalez had a habit of carrying large amounts of money in his pocket and liked to show off the cash. Police believed that appellant had borrowed money from Gonzalez but did not pay him back.

Police later questioned appellant about Gonzalez's murder at the Harris County jail. Appellant denied having any involvement in his murder. When asked if he had ever called his sister and brother-in-law and told them that he killed a man with a knife, appellant replied that he told them lies so that they would let him borrow money.

Joseph Truppi, an HCIFS case management supervisor, testified about the comparison analysis of the DNA profile obtained from Gonzalez's body and car to appellant's DNA sample. The results showed "very strong support" that appellant was a contributor to the DNA obtained from the interior handle of the driver-side door, steering wheel, and ignition of Gonzalez's car; "moderate support" that appellant was a contributor to the DNA obtained from the back pocket of Gonzalez's pants and left hand; and "very strong support" that appellant was a contributor to the DNA obtained from Gonzalez's right hand and his ankles.

During the State's closing, the prosecutor argued that the evidence proved beyond a reasonable doubt that appellant had killed Gonzalez because it showed that Gonzalez and appellant had been co-workers, appellant lived in close proximity to the carwash, the surveillance footage showed a man walking from the carwash

toward the apartment complex where appellant lived, and appellant told his sister and brother-in-law that he had stabbed somebody. The prosecutor then discussed the results of the DNA comparison analysis, stating "The DNA is incredibly probative in this case, and it tells you who the killer is."

The jury assessed appellant's punishment at confinement for life and a $10,000 fine. This appeal followed.

## Jury Instruction

In his first point of error, appellant contends that the trial court reversibly erred in denying defense counsel's request for a jury instruction on the lesser-included offense of manslaughter.

### A. Standard of Review

We review a trial court's denial of a lesser-included offense instruction in the jury charge for an abuse of discretion. *See Threadgill v. State*, 146 S.W.3d 654, 666 (Tex. Crim. App. 2004); *Steele v. State*, 490 S.W.3d 117, 126 (Tex. App.—Houston [1st Dist.] 2016, no pet.).

### B. Applicable Law

Courts use a two-step analysis to determine whether an instruction on a lesser-included offense should be given to the jury. *Hall v. State*, 225 S.W.3d 524, 535–36 (Tex. Crim. App. 2007); *McKinney v. State*, 207 S.W.3d 366, 370 (Tex. Crim. App. 2006); *Rousseau v. State*, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993). A defendant

is entitled to a charge on a lesser-included offense if (1) the lesser-included offense is included within the proof necessary to establish the offense charged, and (2) some evidence exists in the record that would permit a jury rationally to find that the defendant is guilty only of the lesser offense. *Cavazos v. State*, 382 S.W.3d 377, 382–83 (Tex. Crim. App. 2012); *Mathis v. State*, 67 S.W.3d 918, 925 (Tex. Crim. App. 2002). An offense may be a lesser-included offense if it differs from the charged offense only in the respect that a less culpable mental state is enough to establish its commission. *See* TEX. CODE CRIM. PROC. art. 37.09(3).

"The credibility of the evidence and whether it conflicts with other evidence or is controverted may not be considered in determining whether an instruction on a lesser-included offense should be given." *O'Brien v. State*, 89 S.W.3d 753, 755 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd). As long as some evidence, regardless of its strength or weakness, raises the issue that the defendant was guilty only of the lesser offense, the lesser-included offense instruction must be given. *Cavazos*, 382 S.W.3d at 383; *O'Brien*, 89 S.W.3d at 755 (citing *Saunders v. State*, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992)). "Meeting this threshold requires more than mere speculation—it requires affirmative evidence that both raises the lesser-included offense and rebuts or negates an element of the greater offense." *Cavazos*, 382 S.W.3d at 385. The lesser-included offense must be "a valid, rational alternative to the charged offense." *Bullock v. State*, 509 S.W.3d 921, 925 (Tex. Crim. App. 2016).

"[I]t is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense; rather, there must be some evidence directly germane to the lesser-included offense for the finder of fact to consider before an instruction on a lesser-included offense is warranted." *Id.*

**C.   Analysis**

Manslaughter is a lesser-included offense of murder. *Moore v. State*, 969 S.W.2d 4, 9 (Tex. Crim. App. 1998). A person commits the offense of manslaughter if he recklessly causes the death of an individual. *See* TEX. PENAL CODE § 19.04. A person acts recklessly, or is reckless, with respect to the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. *Id.* § 6.03(c). "Manslaughter is a result-oriented offense: the mental state [of recklessness] must relate to the results of the defendant's actions." *Britain v. State*, 412 S.W.3d 518, 520 (Tex. Crim. App. 2013). The first prong of the test for determining whether appellant was entitled to an instruction on a lesser offense is satisfied. *See Rousseau*, 855 S.W.2d at 672.

We next consider whether some evidence exists in the record that would permit a jury rationally to find that the defendant is guilty only of the lesser offense. *See Cavazos*, 382 S.W.3d at 382–83; *Mathis*, 67 S.W.3d at 925. Citing *Westbrook v. State*, 846 S.W.2d 155 (Tex. App.—Fort Worth 1993, no pet.), appellant contends that the trial court should have instructed the jury on the lesser-included offense of

15

manslaughter because there is evidence of sudden passion.[3] *See id*. at 158. He points

to Sergeant Barrow's testimony agreeing that Marquez's killing was "a violent,

chaotic, emotionally charged event" and that it was not premeditated, appellant

loved Marquez, and they were emotionally and sexually close. Appellant's argument

is misplaced. Sudden passion is not an element of manslaughter. *See* TEX. PENAL

CODE § 19.04. Rather, it is a basis for mitigation at sentencing.[4] *See id*. § 19.02(d);

*Beltran v. State*, 472 S.W.3d 283, 293 (Tex. Crim. App. 2015) ("Sudden passion is

a mitigating circumstance that is relevant to determining the appropriate punishment

of a defendant."); *Trevino v. State*, 100 S.W.3d 232, 237 (Tex. Crim. App. 2003)

("[I]f a defendant is convicted of murder, he may argue at punishment that he caused

the death while under the immediate influence of sudden passion arising from an

adequate cause.").

The relevant inquiry is whether the record contains some affirmative evidence

that appellant did not intend to kill or cause serious bodily injury to Marquez, and

---

[3]    "Sudden passion" means "passion directly caused by and arising out of provocation by the individual killed . . . which passion arises at the time of the offense and is not solely the result of former provocation." TEX. PENAL CODE § 19.02(a)(2). "Adequate cause" is "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1).

[4]    The trial court also recognized that sudden passion is relevant in determining punishment, stating, "[t]he only reason why I want to get this out in the open here is I don't want to get into any of this sudden passion as a defense, you know. It's punishment, not a defense."

16

that appellant was aware of but consciously disregarded a substantial and unjustifiable risk that death would occur as a result of his conduct. *See Cavazos*, 382 S.W.3d at 385. In this regard, appellant points to statements in his recorded interview that he "lost conscience," he did not intend to kill Marquez or cause her serious bodily injury, and he could not recall how many times he struck Marquez with the hammer as some evidence demonstrating a lack of awareness of his own conduct.

In appellant's interview, the following exchange took place:

Detective Flores: Okay. So you were going to start having sex.

Appellant: Uh-huh.

Detective Flores: But she didn't want to.

Appellant: Well, because of her partner's problem.

Detective Flores: Uh-huh. Okay. So she got, she got up and then it all happened. Okay.

Appellant: She wanted to take the stress out of me, but, I mean, what could I do . . . .

Detective Flores: Because she didn't want to.

Appellant: Well, yes.

Detective Flores: She didn't want to have sex.

Appellant: Well, because of the problem she had with her partner. Every time she wanted to have sex with her partner, I mean, it either didn't start off well or ended bad.

Detective Flores: Uh-huh.

17

Appellant: So, I mean, "What's the matter?" "I can't handle you nor him!"

Detective Flores: And you got mad.

Detective Barrow: Okay.

Appellant: I mean, well, yes.

Detective Flores: Okay, if it's the truth, it's the truth, all right, all right. So you got mad and got out of control . . . you grabbed the hammer or how?

Appellant:  I lost, I lost my conscience [sic].[5]

. . . .

Detective Flores: So, show me how you hit her.

Detective Barrow: Yeah, like if he was her. Like, like, like how did you hit her with the hammer?

Appellant: Well, with the hammer, on the head, so …

Detective Flores: How, like this? How? I need to know how.

Appellant: I mean, the hits were different, I mean, she would turn around and she would say to me, "Luis, don't do it, Luis!"

Detective Flores: How many times did you hit her?

Appellant: Uh . . .

Detective Flores: How many times?

---

[5] Although the written translation of appellant's statement reflects that he said "conscience," Sergeant Barrow testified that appellant actually said "conscious," stating that "[i] the context that he said it, it sounded as if he was saying he became angry, enraged, and he just – he acted."

18

Appellant: I don't remember, like six.

Detective Flores: Six times.

Appellant: Yes, like (unintelligible).

Detective Flores: She started to bleed?

Appellant: Yes.

Detective Flores: A little or a lot?

Appellant: It was a lot, she asked me for forgiveness, I felt inside me . . . I mean, I felt bad, if I didn't do it and I asked her for forgiveness, she also asked me for forgiveness. I mean . . . "I'm sorry," I said, "Mari, I'm sorry I didn't mean to hit you" and I covered her up with a sheet and then with a rag.

A person acts recklessly when he is "aware of but consciously disregards a substantial and unjustifiable risk" that the result will occur. TEX. PENAL CODE § 6.03(c). "Recklessness requires the defendant to actually foresee the risk involved and to consciously decide to ignore it." *Williams v. State*, 235 S.W.3d 742, 751 (Tex. Crim. App. 2007). Appellant's assertion that he "lost conscious" and could only recall striking Marquez six times with the hammer and was therefore unaware of his own actions does not support a conclusion that he acted recklessly. *See Schroeder v. State*, 123 S.W.3d 398, 401 (Tex. Crim. App. 2003) (holding defendant's testimony that he "blacked out" while shooting victim was no evidence of less culpable mental state of recklessness because person cannot consciously disregard risk of which he is unaware); *see also Tyler v. State*, No. 09-16-00253-CR, 2018 WL 1188817, at *4

19

(Tex. App.—Beaumont Mar. 7, 2018, no pet.) (mem. op., not designated for publication) (concluding evidence that defendant "blacked out" when he pulled trigger and did not remember what happened did not demonstrate that defendant recklessly caused death of complainant); *Foster v. State*, No. 03-05-00801-CR, 2007 WL 1451997, at *3 (Tex. App.—Austin May 17, 2007, pet. ref'd) (mem. op., not designated for publication) (concluding defendant's claim that he was unaware of his conduct and any risks associated with his conduct at time he stabbed complainant did not support charge on lesser-included offense of manslaughter based on claim of recklessness).

Appellant's assertion that his statement to police that he "didn't mean" to hit Marquez is some evidence to support an instruction on the lesser-included offense of manslaughter fares no better. In determining whether there is evidence to support a charge on recklessness, a statement that the defendant did not intend to kill the victim "cannot be plucked out of the record and examined in a vacuum." *Gahagan v. State*, 242 S.W.3d 80, 86 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (quoting *Godsey v. State*, 719 S.W.2d 578, 584 (Tex. Crim. App. 1986)); *see Arnold v. State*, 234 S.W.3d 664, 672 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ("[A defendant's] denial that he intended to kill the victim does not, of itself, raise the issue of manslaughter."). Here, the evidence showed that appellant became angry because Marquez did not want to have sex. Appellant struck Marquez in the face and

head twenty-one times, causing her scalp to split open and exposing her skull. Appellant's blows to Marquez also fractured her upper and lower jaw bones and dislocated several of her teeth. Appellant told police that Marquez was bleeding "a lot" and that although she pleaded with him to stop, he continued striking her with the hammer. Appellant's statements also indicate that he waited for Marquez to stop breathing and then wrapped up her body rather than seek medical assistance. Appellant's statement that he "didn't mean to" does not negate the evidence of his intent to kill or cause serious bodily injury to Marquez by repeatedly striking her with a hammer. *See Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000) ("Given the number of blows, severity of the injuries, and particularly the evidence that the victim was also strangled with the towel, appellant's statement that he 'lost it' and did not realize how hard he hit the victim does not negate the physical evidence showing an intent to kill."). In light of the entire record, appellant's statement that he did not intend to hit Marquez is not evidence allowing a jury to find that his actions were reckless. *See Mathis*, 67 S.W.3d at 926 (finding that other than defendant's own testimony that he did not intend to kill anyone, there was no other evidence to support his theory).

We conclude that the second part of the test for determining whether appellant was entitled to an instruction on the lesser-included offense is not satisfied. *See Rousseau*, 855 S.W.2d at 672. There is no evidence in the record that would permit

a rational jury to find that appellant is guilty only of manslaughter. *Mathis*, 67 S.W.3d at 925. We overrule appellant's first issue.

## Voluntariness of Consent

In his second point of error, appellant contends that the trial court reversibly erred in admitting his buccal swabs and the DNA analysis results because police did not obtain his effective consent to collect his DNA.

### A. Standard of Review and Applicable Law

A bifurcated standard applies when we review a trial court's ruling on a request to suppress evidence. *See State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019) (citing *Lerma v. State*, 543 S.W.3d 184, 189–90 (Tex. Crim. App. 2018); *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005)). We give almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor, but we review de novo questions of law and mixed questions of law and fact not turning on credibility and demeanor. *See Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). "We will sustain the trial judge's ruling if that ruling is reasonably supported by the record and is correct on any theory of law applicable to the case." *State v. Weaver*, 349 S.W.3d 521, 525 (Tex. Crim. App. 2011) (internal

quotation marks omitted); *accord Gonzalez v. State*, 195 S.W.3d 114, 126 (Tex. Crim. App. 2006).

Under the Fourth and Fourteenth Amendments, a search conducted without a warrant issued upon probable cause is "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). One such established exception is a search conducted with the voluntary consent of the suspect. *See Meekins v. State*, 340 S.W.3d 454, 458 (Tex. Crim. App. 2011); *see also Rodriguez v. State*, 313 S.W.3d 403, 406 (Tex. App.— Houston [1st Dist.] 2009, no pet.) ("Consent is among the most well[-]established exceptions to the presumption that a warrantless search is unreasonable."). Consent can be communicated to law enforcement in various ways, "including by words, action, or circumstantial evidence showing implied consent." *Meekins*, 340 S.W.3d at 458. The consent, however, must be voluntary to be valid. *Reasor v. State*, 12 S.W.3d 813, 817 (Tex. Crim. App. 2000).

When analyzing the voluntariness of consent, trial courts "must [assess] the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Id.* at 818 (quoting *Schneckloth*, 412 U.S. at 226). We consider the following factors in determining voluntariness: appellant's age, education, and intelligence; the length of detention; any constitutional advice

given to the defendant; the repetitiveness of the questioning; and the use of physical punishment. *See id*. We also consider whether appellant was in custody, handcuffed, or had been arrested at gunpoint; whether *Miranda* warnings were given; and whether appellant had the option to refuse to consent. *See id.* In examining the totality of the circumstances surrounding consent to search, the trial court should consider the circumstances before the search, reaction of the accused to pressure, and any other factor deemed relevant. *Id.*

The standard for measuring the scope of consent under the Fourth Amendment is that of "objective" reasonableness—"what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Weaver*, 349 S.W.3d at 526. "[C]ourts review the totality of the circumstances . . . from the point of view of the objectively reasonable person, without regard for the subjective thoughts or intents of either the officer or the citizen." *Meekins*, 340 S.W.3d at 459. The ultimate question is whether the person's "'will ha[s] been overborne and his capacity for self-determination critically impaired,'" such that his consent to search must have been involuntary. *Id.* (quoting *United States v. Watson*, 423 U.S. 411, 424 (1976) (quoting *Schneckloth*, 412 U.S. at 225)). The State "must prove by clear and convincing evidence" that "positive and unequivocal" consent was given. *Meeks v. State*, 692 S.W.2d 504, 509 (Tex. Crim. App. 1985); *Hutchins v. State*, 475 S.W.3d

496, 498 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (quoting *Meek*s, 692 S.W.3d at 509).

## B.    Analysis

Following his arrest, appellant was transported to the police station for questioning. At the beginning of the interview, Sergeant Barrow read appellant his *Miranda* warnings and appellant responded that he understood each of his rights. Appellant was not handcuffed during his interview, and he was offered a snack and water and the opportunity to go to the bathroom.

Sergeant Barrow testified that after appellant confessed to killing Marquez, he asked appellant for his consent to obtain a sample of his saliva:

Q: And so in doing that, were you explaining to him at this point what you wanted his consent to do?

A: Yes.

Q: How did you explain that?

A: I put it in simplest terms, just a sample of his DNA. You know, it would be a swab that would be taken from the inside of your mouth. And then I demonstrated to him how this would be done.

Q: Did you mention the term actually "DNA" in Spanish?

A: Yes.

Q: Did you also mention "saliva"?

A: Yes.

Q: And were you clear with him about the swab needing to go inside his mouth?

A: Yes.

Sergeant Barrow testified that after appellant signaled his consent to the DNA sample by nodding, he presented appellant with an English written consent form. The transcribed interview reflects that the following exchange between appellant and Sergeant Barrow took place:

> Detective Barrow[6]: And sir, I wanted to um . . . how do you say it, a sample of your DNA, inside of your, of your lip. Just . . . you have a swab . . .
>
> . . . .
>
> Detective Barrow: Those, they're just . . . they're just for cleaning, so you're going to put it in your mouth for about five seconds and then take it out and we'll take it with us. Is it okay if we take your DNA sample? Okay. I just have to sign here for saliva. Initial here. And then your signature. Wait a minute . . . initial here . . .
>
> Appellant: Here.
>
> Detective Barrow: In the second one. Uh-huh. And your signature, okay and print your name here. Thank you. And this form just says that you give us permission to get a sample. It's 11:30. Open your mouth. She's just going to put them in real quick, okay. Just like that. Okay, thank you very much, sir.

The consent form states, in part:

---

[6] Although the written translation of appellant's interview indicates that Detective Flores asked appellant for consent to provide a sample of his saliva, the consent form and the testimony at trial reflect that it was Sergeant Barrow who asked for consent.

I am aware that the purpose of the sample(s) being taken from me is to submit the sample(s) to a qualified laboratory for analysis and possible comparison.

I give consent of my own free will and accord, and without being subjected to threats, promises, compulsion, or unlawful influence. I know that the examination results obtained from the sample(s) can and may be used against me and/or others in a criminal prosecution proceeding.

Appellant initialed and signed the written consent form. When the State questioned Sergeant Barrow about the written form, the following exchange took place:

Q. Now, would it be fair to say that the substance of this form is in English language?

A. Yes, it is.

Q. Does a—does a Spanish version of this type of a form exist?

A. Yes, there are.

Q. So, I mean you had, we can all agree, just engaged in a discussion with this defendant in Spanish. Can you explain to us so that we understand why an English form was used in this instance?

 A. In this instance, I had an English form readily available; and I didn't have time to go back and grab another one. And at this point, with the conclusion of the interview and the starting of the booking process, we just wanted to come and give him the form; and I would explain to him what the form was before he signed it.

Q. Is that why we saw an oral explanation of the DNA consent process from you on State's 68?

A. That's correct.

. . . .

Q. Prior to asking Mr. Romero to put his initials or sign anything anywhere, had you explained the DNA process to him?

A. Yes.

Q. Had you explained to him what the form was?

A. Yes.

Q. And prior to showing him this form and letting him sign it, had you— had you received his consent to go ahead and swab his mouth?

A. Yes.

On voir dire, Sergeant Barrow testified that he told appellant what the form was but he did not translate the form into Spanish for appellant or tell appellant what the form said. Defense counsel objected to admission of the consent form into evidence because it was in English and it was not read to him. The prosecutor responded arguing that it was not the State's position that valid consent existed based solely on the written form but, rather, that appellant had provided valid oral consent. Although noting that the officers should have obtained a consent form in Spanish or read the form to appellant in Spanish, the trial court overruled the objection and admitted the written consent form into evidence. The trial court later overruled subsequent objections to the admissibility of appellant's buccal swabs and the DNA results based on invalid consent.

Appellant argues that his consent was involuntary under the totality of the circumstances because: (1) law enforcement used an excessive show of force to obtain his consent; (2) he was not informed that he had the right to refuse to give consent; and (3) he could not read the consent form and it was not translated for him.

Appellant argues that the show of force by police was egregious in this case because the interview took place in an interrogation room of the police station with two officers at least one of whom was armed. While it is true that a display of weapons can be a coercive factor that reduces the likelihood that consent is given voluntarily, *see Manzi v. State*, 56 S.W.3d 710, 717 (Tex. App.—Houston [14th Dist.] 2001), *aff'd*, 88 S.W.3d 240 (Tex. Crim. App. 2002), we find nothing in the record showing that this was the case here. There is no evidence that Sergeant Barrow ever drew his firearm or displayed it in a threatening manner. There is also nothing in the record suggesting that appellant felt intimidated by the presence of his firearm or that appellant was even aware that Sergeant Barrow was armed. And although appellant was under arrest at the police station when he gave consent, this does not automatically render his consent involuntary. *Johnson v. State*, 68 S.W.3d 644, 653 (Tex. Crim. App. 2002).

Next, appellant contends that his consent was involuntary because he was not informed that he had the right to refuse consent. Although a police officer's failure to inform the accused that he can refuse consent is a factor to consider, the absence

29

of such information does not automatically render the accused's consent involuntary. *Id.*; *see also Anh Tran v. State*, No. 01-18-00623-CR, 2019 WL 5243102, at *3 (Tex. App.—Houston [1st Dist.] Oct. 17, 2019, no pet.) (mem. op., not designated for publication) ("And while Salina did not inform Tran that he could refuse consent, he had no affirmative duty to do so.") (citing *Manzi*, 56 S.W.3d at 719); *Tippin v. State*, No. 13-17-00201-CR, 2018 WL 3675646, at *6 (Tex. App.—Corpus Christi–Edinburg Aug. 2, 2018, pet. ref'd) (mem. op., not designated for publication) ("Warning an individual of their right to refuse consent is not necessary for a voluntary grant of consent."). We also note that appellant had previously been given his *Miranda* warnings and acknowledged that he understood them which is a factor that courts consider when determining whether consent was voluntary. *See Reasor*, 12 S.W.3d at 818; *see also Manzi*, 56 S.W.3d at 719 (concluding trial court did not err in finding clear and convincing evidence that defendant had voluntarily consented to search of hotel room where, among other things, trial court impliedly found that officer never pointed his weapon at defendant, no officer intimidated defendant with his firearm, officer gave defendant his *Miranda* warnings, and defendant acknowledged to officer that he understood his rights). Although Sergeant Barrow did not inform appellant that he could refuse consent, neither did he tell appellant that he was obligated to comply or that he could not refuse the request for a sample. *See Martinez-Hernandez v. State*, 468 S.W.3d 748, 765 (Tex. App.—San

Antonio 2015, no pet.) (considering fact that neither officer told defendant that he had to comply or could not refuse request for DNA sample in concluding that trial court's determination that defendant voluntarily consented to DNA test was supported by record). However, we also note that the written consent form signed by appellant—that was in English and not translated into Spanish—states "I have been informed that I have the right to refuse to provide consent for the collection of my samples."

Appellant further argues that his consent was involuntary because the written consent form was not translated into Spanish. He contends that while Sergeant Barrow told him what the form was, he did not tell appellant what it said, and that Sergeant Barrow's explanation in Spanish did not accurately explain what DNA is, what the police would like it for, and how it can be used in a criminal case.

A written consent form is not required to establish voluntary consent. *See Montoya v. State*, 744 S.W.2d 15, 25 (Tex. Crim. App. 1987), *overruled on other grounds by Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996). A valid consent may be oral. *Velez v. State*, 240 S.W.3d 261, 266 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd); *Ramos v. State*, 124 S.W.3d 326, 333 (Tex. App.—Fort Worth 2003, pet. ref'd). The consent, however, must be voluntary to be valid. *Reasor*, 12 S.W.3d at 817.

The record shows that after he confessed to killing Marquez, appellant was asked by Sergeant Barrow in Spanish for a DNA sample. Sergeant Barrow testified that he used the terms DNA and saliva in Spanish.[7] Sergeant Barrow explained to appellant that he was requesting his consent to take a sample of his DNA, that it would require swabbing the inside of appellant's mouth, and that the written form would allow the sample to be taken. Sergeant Barrow then demonstrated to appellant how the sample would be taken.

We conclude that the State did not meet its burden to prove by clear and convincing evidence that appellant's consent to obtain his DNA was, in fact, voluntary. *See Meeks*, 692 S.W.2d at 509. While appellant was told what the form was and how the sample would be taken, he was given no explanation about what his DNA sample would be used for or that the results could be used against him in a criminal proceeding. The written consent form signed by appellant stated: "I am aware that the purpose of the sample(s) being taken from me is to submit the sample(s) to a qualified laboratory for analysis and possible comparison," "I give consent of my own free will and accord, and without being subjected to threats, promises, compulsion, or unlawful influence," and "I know that the examination results obtained from the sample(s) can and may be used against me and/or others in

---

[7]     The video shows that Sergeant Barrow pronounced "D-N-A" in Spanish. The Spanish translation of DNA is "ADN." *See* https://dictionary.cambridge.org/translate (last visited August 27, 2024).

a criminal prosecution proceeding." However, the form given to appellant was in English and Sergeant Barrow did not translate the form into Spanish for him or otherwise tell appellant what the form said. Thus, there is no evidence that appellant knew the purpose of taking his DNA sample, i.e., to submit it for analysis and possible comparison, or that it could be used against him in a criminal prosecution proceeding and was not simply part of the booking process. There is also no evidence in the record about appellant's education level or intelligence. *See Reasor*, 12 S.W.3d at 818. Appellant did not give "positive and unequivocal" consent to collect his DNA. *See Meeks*, 692 S.W.2d at 509. Based on the totality of the circumstances, we hold that the trial court erred in determining that appellant's consent was voluntary.

Having concluded that the trial court erred in admitting appellant's DNA evidence because, in reviewing the totality of the circumstances surrounding the collection of appellant's DNA sample, we find the State did not meet its burden to prove by clear and convincing evidence that appellant's consent was voluntary, we must now determine whether admission of that evidence during the punishment phase of trial was harmful.

## C. Harm Analysis

Appellant contends that he was harmed by the inclusion of the DNA evidence during the sentencing phase of his trial. He argues that without the admission of his

illegally obtained DNA to connect him with Gonzalez's vehicle, clothing, and body, police had no concrete evidence to connect him to Gonzalez's murder. He asserts that the admission of evidence about a second murder during sentencing undoubtedly affected the jury and influenced their verdict of life imprisonment and assessment of the maximum fine.[8]

When a trial court admits evidence obtained in violation of the Fourth Amendment, that error is subject to review under the constitutional harmless error standard. *See* TEX. R. APP. P. 44.2(a); *Hernandez v. State*, 60 S.W.3d 106, 108 (Tex. Crim. App. 2001); *see also Adell v. State*, No. 01-21-00439-CV, 2023 WL 4938111, at \*39 (Tex. App.—Houston [1st Dist.] Aug. 3, 2023, pet. ref'd) (mem. op., not designated for publication). We must reverse the trial court's judgment of conviction unless we determine "beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a); *see also Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008). In applying the harmless error test, the primary question is whether there is a "reasonable possibility" that the error might have contributed to the conviction. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (internal quotations omitted).

Rather than focusing on the propriety of the outcome of the trial, we must calculate, as much as possible, the probable impact of the evidence on the jury in

---

[8] The State's brief on appeal does not include a harm analysis.

light of the existence of other evidence. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000). We "should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment,'" and if applicable, we may consider the nature of the error, the extent to which it was emphasized by the State, its probable implications, and the weight a juror would probably place on the error. *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011) (quoting TEX. R. APP. P. 44.2(a)). This requires us to evaluate the entire record in a neutral, impartial, and even-handed manner and not "in the light most favorable to the [State]." *Harris v. State*, 790 S.W.2d 568, 586 (Tex. Crim. App. 1989) (internal quotations omitted), *disagreed with in part on other grounds by Snowden*, 353 S.W.3d at 821–22; *Wilson v. State*, 473 S.W.3d 889, 902 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd); *Cantu v. State*, 395 S.W.3d 202, 211 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd). Error does not contribute to the conviction or punishment if the jury's verdict would have been the same even if the erroneous evidence had not been admitted. *Clay v. State*, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007).

Here, the State introduced evidence of the results of the comparative analysis of the DNA profile obtained from Gonzalez's body and car to appellant's DNA sample. The jury heard testimony that there was "very strong support" that appellant

was a contributor to the DNA obtained from the interior handle of the driver-side door, steering wheel, and ignition of Gonzalez's car; "moderate support" that appellant was a contributor to the DNA obtained from the back pocket of Gonzalez's pants and left hand; and "very strong support" that appellant was a contributor to the DNA obtained from Gonzalez's right hand and his ankles. The DNA evidence was strong evidence connecting appellant to Gonzalez's murder. *See Roberson v. State*, 16 S.W.3d 156, 168 (Tex. App.—Austin 2000, pet ref'd) (concluding DNA (RFLP analysis) evidence was "strong evidence" of defendant's participation in crime); *see also Wilson v. State*, 185 S.W.3d 481, 491 (Tex. Crim. App. 2006) (Johnson, J., concurring) (recognizing "DNA analysis is a powerful tool in determining guilt or innocence").

By contrast, the other evidence connecting appellant to Gonzalez's murder was weak. That evidence consisted of the following: (1) an individual from the homeless encampment told police that Gonzalez's car had been left at the carwash between 2:15 a.m. and 3:30 a.m., and surveillance video from a nearby apartment complex showed an unidentifiable man walking away from the carwash shortly after Gonzalez's car was left there toward appellant's apartment complex; (2) police obtained a hit on the license plate of Gonzalez's car which led police to the apartment complex where Gonzalez lived with several roommates, one of whom gave police the name "Luis"; (3) appellant lived near the carwash and he and Gonzalez were co-

workers; (4) appellant once told his sister and brother-in-law that he had stabbed somebody; (5) Gonzalez had a habit of carrying large amounts of cash in his pocket and liked to show it off; and (6) appellant borrowed money from Gonzalez but did not pay him back.

We may also consider the extent to which the State emphasized the erroneously admitted DNA evidence at the punishment hearing. *Snowden*, 353 S.W.3d at 820. In its opening statement, the prosecutor told the jury that "you'll see a forensic link, a forensic link that you'll find to be unmistakable, back to this defendant and that identifies him as the killer for a second time." In its closing, after detailing the results of the DNA analysis, the prosecutor told the jury "[t]he DNA is incredibly probative in this case, and it tells you who the killer is."

Appellant argues that without the use of his DNA to connect him with Gonzalez's vehicle, clothing, and body, there was no concrete evidence linking him to Gonzalez's murder. We agree. The statutory range of punishment for first-degree murder is life or five to ninety-nine years imprisonment and a possible fine not to exceed $10,000. TEX. PENAL CODE §§ 12.32, 19.02(c). The jury assessed appellant's punishment at confinement for life and a $10,000 fine.

The trial court's error in admitting appellant's DNA evidence at the punishment hearing amounts to constitutional error. Based on the record before us, we cannot say beyond a reasonable doubt that the error did not contribute to

appellant's punishment. *See* TEX. R. APP. P. 44.2(a); *see also Neal*, 256 S.W.3d at 284. Because we conclude that the error was harmful, we sustain appellant's second point of error.

## Conclusion

We affirm the trial court's judgment on guilt. We reverse the trial court's judgment as to punishment and remand the case to the trial court for a new punishment hearing. *See* TEX. CODE CRIM. PROC. art. 44.29(b).

 

                                               Amparo Monique Guerra
                                               Justice

Panel consists of Justices Landau, Countiss, and Guerra.

Do not publish. TEX. R. APP. P. 47.2(b).